UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


WAN KYU PARK,

                                    CASE NO. 4:25-cv-0267-MW/MJF

          Plaintiff,

v.

FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, LAURA
GREENE, ERIC PALM, REBECCA
PETERSON, and JAMES CLARK,
in both their official and
individual capacities,

          Defendants.
_____/


DEPOSITION OF:              KATHLEEN AMM

DATE:                       FRIDAY, MARCH 27, 2026

TIME:                       COMMENCING AT:  11:16 A.M.
                            CONCLUDING AT:  12:35 P.M.
                            (EASTERN STANDARD TIME)

LOCATION:                   VIA VIDEOCONFERENCE
                            (ZOOM)

REPORTED BY:                CELENA RODRIGUEZ, RPR


APEX REPORTING, INC.
P.O. BOX 180492
TALLAHASSEE, FLORIDA  32318
(850) 597-5185
apexreportingservices@gmail.com
www.tallycourtreporting.com


APEX REPORTING, INC.    TALLAHASSEE, FLORIDA    850-597-5185

VIDEOCONFERENCE APPEARANCES


On Behalf of the Plaintiff:

    LAW OFFICE OF MARIE A. MATTOX, P.A.
    BY:  Thomas L. Dickens III, Esq.
    thomas.dickens@mattoxlaw.com
    203 N. Gadsden Street
    Tallahassee, Florida 32301
    (850) 383-4800


On Behalf of the Defendants:

    BRIAN C. KERI, P.A.
    BY:  Brian C. Keri, Esq.
    brianckeri@earthlink.net
    3375-H Capital Circle NE, Suite 4
    Tallahassee, Florida 32308
    (850) 297-2222


Also Present:

    Wan Kyu Park

INDEX OF PROCEEDINGS

DEPOSITION OF KATHLEEN AMM                          PAGE

    Examination by Mr. Dickens                  4

    Examination by Mr. Keri                     43

    Certificate of Oath                        45

    Reporter's Certificate                     46

    Errata Sheet                               47

    Errata Letter                              48

EXHIBITS MARKED

(NONE MARKED)

Deposition taken before Celena Rodriguez, Registered Professional Reporter and Notary Public in and for the State of Florida at Large in the above cause.

* * * *

KATHLEEN AMM

acknowledged having been duly sworn to tell the truth and testified upon her oath as follows:

THE WITNESS:  Yes.

EXAMINATION

BY MR. DICKENS:

Q.  Good morning, Dr. Amm.  My name is Thomas Dickens.  I am the attorney for Dr. Park in this matter of Park v. FSU.  We're going to go as quickly as we can, understanding that all of you folks have pretty demanding schedules, and I want to respect that time.

If at any time during the deposition my words come out way too quickly, just stop me and ask me to please repeat so that you are clear as to exactly what all of my questions are, okay?

A.  Yes.

Q.  It is Dr. Amm, right?

A.  That's fine.  Thank you.

Q.  Dr. Amm, where are you from?

A.  Originally?  Where was I born; is that the

question?

Q.    Yeah.

A.    I was born in Boston, Massachusetts.

Q.    Did you go to high school in Boston, Massachusetts?

A.    No.  I went to high school in Houston, Texas.

Q.    Okay.  And what high school did you graduate from?

A.    St. Agnes Academy.

Q.    Is that a parochial school?

A.    Yes.  It was a Catholic school run by the Dominican Sisters.

Q.    Okay.  All right.  Have you ever been in the military?

A.    No.

Q.    Where did you go to college?

A.    I went to the University of Toronto for undergrad.  And then for graduate school, I started at the University of Illinois and then transferred to Florida State University.

Q.    Okay.  And what degrees did you receive at FSU?

A.    At FSU, I received my Ph.D. in condensed matter physics.

Q.    What year did you obtain your Ph.D.?

A.   It was right at the beginning of 1998, I believe.

Q.   Okay.  So what did you do after you obtained your Ph.D.?

A.   I worked for a -- well, I looked for a job in the Albany, New York, area, and I found one at a company called Lydall Manning, non -- or insulation, advanced materials, and worked on cryogenic insulation stuff.

Q.   Okay.  How long were you at that position?

A.   I was at that position for one year.  And then I was hired by GE Global Research as a physicist.

Q.   Okay.  And how long were you there?

A.   I was at GE Global Research in a series of positions for 19 years.

Q.   Okay.  So that takes us about to 2018/'17 time frame; is that right?

A.   2018, yes.  Yes.  And then --

Q.   Where -- oh.

A.   No, please.

Q.   You already anticipated.  Where did you go?

A.   I went to Brookhaven National Laboratory.

Q.   All right.  How long were you there?

A.   About five years.

Q.   And what were your duties there?

A.    I was the director of the magnet division at Brookhaven National Labs.  So I oversaw a team of about 30 people.  Engineers, scientists, and technicians.

Q.    Okay.  All right.  And then what did you do?

A.    Well, I obtained this position as the director of the National High Magnetic Field Laboratory.

Q.    All right.  Do you remember the month and year that you became the director of the MagLab?

A.    Yes.  It was May of 2024.

Q.    Okay.  Who was the director before you?

A.    Dr. Gregory Bobinger.

Q.    Okay.  And is Dr. Bobinger still at FSU?

A.    Yes, he is.

Q.    Okay.  What is he doing at FSU?

A.    He is the direct -- he has a title of Director Emeritus at the MagLab, and, you know, he does a series of different things for the university.  Two activities he's engaged with at the Magnet Lab is reviewing our gypstack project.  And he also recently served on a -- to organize a Red Team review for our renewal proposal.

But you would have to ask his manager what his other duties are.  But those are the two I'm aware of that he works with me on.

Q.   Do you know Dr. Park?

A.   I'm sorry.  Can you repeat the question?

Q.   Do you know Dr. Park?

A.   Dr. Park?

Q.   Yes.

A.   Yes.  I have met Dr. Park once over Zoom.

Q.   Okay.  All right.  And what was the occasion to meet him over the Zoom?

A.   It was a step one grievance filing, and Dr. Park was presenting the step one grievance to me.

Q.   Okay.  Now, when you became director, you were -- you were briefed on Dr. Park's situation, correct?

A.   I was briefed by Eric Palm very briefly about the situation, yes.

Q.   All right.  Where did that briefing occur?

A.   I believe it was either in Eric's office or mine.  I don't recall.

Q.   Okay.  And what did Dr. Palm say?

A.   What he had said is that there was a nonrenewal of -- of Dr. Park, based upon some -- based upon, basically, the -- that there was, you know, not need for his work by the lab.

In addition to that, he had talked about -- separate from that, he had talked about a number of

performance issues that Dr. Park had had in Professor Laura Greene's lab and that they had given -- reassigned Dr. Park to some other duties to see if, you know, he could potentially work in this other area since the major issues that he had had with students in the lab made it impossible for Dr. Park to work with students.

That, I think, was the full content of what he said to me.

Q. So you knew him to be permanently prohibited from working with students?

A. Yes. I had heard about that.

Q. Okay. And from whom did you hear that?

A. From Dr. Park as well. Yes. I believe he brought that up in the -- the step one grievance as well.

Q. Okay. And you knew that to be the truth?

A. Yes.

Q. Okay.

A. As far as I know, I should say. I mean, that's as far as I know.

Q. Okay. So after that, then you participated in the grievance interview with Dr. Park, correct?

A. That is correct.

Q. All right. So Dr. Palm gives you the

information, and then you go and participate in the grievance procedure, right?

A. Well --

MR. KERI: Form. You can answer.

THE WITNESS: Okay. Thank you.

Prior to the step one grievance interview, Dr. Park had submitted some documentation to the university that I received, and I reviewed all of that paperwork prior to meeting with Dr. Park. And then Dr. Park went through, you know, the information, also, that was in that document.

BY MR. DICKENS:

Q. Okay. When did you meet with Dr. Park?

A. I cannot recall the exact date. It was a while ago, though.

Q. How long did you meet with him?

A. I believe it was at least for an hour.

Q. You said that you did review Dr. Park's submission to you before speaking with him?

A. Correct.

Q. Okay. Do you recall how -- how many documents were presented?

A. It was a fairly lengthy document, but I do not recall the number of pages that were presented.

Q. Okay. But you did review each and every one

of the documents?

A. Absolutely.

Q. Okay. Do you recall the email that was presented by Dr. Park that was from Dr. Palm, drafted on February 24, 2023, discussing nonrenewal of Dr. Park?

A. I -- I don't recall the specifics of that email. I'm sure that it was included in the documentation, but I don't recall the specifics. So if you'd like me to comment on it, please feel free to show it to me.

Q. Okay. And to be sure, you did not address that in your review, correct?

MR. KERI: Form. You can answer.

A. The -- the email there? No. The grievance was on -- can you -- can you remind me of what the specifics of the grievance were on? That's -- because this was a second grievance. There was another grievance prior to me being at the Magnet Lab, and this grievance was on a different topic than --

Q. Sure. The grievance that you reviewed was for the nonrenewal.

A. Okay. That's what I thought. Yes. Yes.

Q. Okay. All right. And so, to be sure, and make sure that I -- that you understand the timeline as

I do --

A.   Mm-hm.

Q.   -- you were aware that Dr. Park received a written reprimand, correct?

A.   Yes, I was aware of that.

Q.   And you were aware that that written reprimand was issued on June 21st of 2023, correct?

A.   I -- I -- as I said, I do not recall the date that it was -- was submitted, but if it's written down on the document, I'm sure that that is the correct date that it was given to him.  I was not at the Magnet Lab at that time.

Q.   I'm going to show you -- you can just open this up.  I'm not marking it as an exhibit right now. It's been previously marked as an exhibit.

So if you go into your chat, click on the chat -- I may have to send it to you again.

A.   I see it.

Q.   Okay.  Go ahead and open that up.

MR. KERI:  And you say that you want that W.K. Park open?  I don't know if there's multiple documents in the chat right now or not.

MR. DICKENS:  It's the last thing that I just submitted.

THE WITNESS:  Oh, it's saying to save it.

MR. DICKENS: Yeah. You have to save it, and then it'll ask you if you want to open it.

THE WITNESS: Okay. Let me see if I can open it. Why isn't it showing up? Okay. Let me try again. Make sure I can save it where I can find it. Okay. I found it.

BY MR. DICKENS:

Q. Okay. Do you recognize that?

A. Yes, I do.

Q. Okay. And you were aware of that before the step one grievance process in the nonrenewal?

A. Yes. Correct.

Q. Okay. So -- and I just asked you about a document that Dr. Park had presented to you in your step one review.

A. Yes.

Q. So the date on -- or what is the date that you see on the June -- or, I'm sorry, the reprimand that's in front of you?

A. It says June 21st, 2023.

Q. Okay. And do you have any reason to dispute that that reprimand was issued on June 21st of 2023?

A. I -- I have no knowledge of when -- when this was given, because -- other than the date on this letter, because I was not at the Magnet Lab at that

time.

Q. Okay. So I previously asked you about a submission, and you indicated you read everything --

A. Yes. Correct.

Q. -- from Dr. Park that included an email from Dr. Palm in February 2023 -- March, April, May, June -- four months before this reprimand was even issued --

A. Mm-hm.

Q. -- discussing nonrenewal.

So my question to you is, do you understand the significance of discussing nonrenewal before any reprimand had even been issued?

MR. KERI: Form.

THE WITNESS: Sorry, Brian? I couldn't hear you.

MR. KERI: Just form. You can answer.

THE WITNESS: Okay. So because -- but the nonrenewal -- nonrenewals at FSU are not linked to disciplinary actions. They are due to the needs of the university.

BY MR. DICKENS:

Q. Understanding that, I'm -- my question was different. My question is --

A. Okay.

Q. -- do you understand the significance of

discussing nonrenewal before any discipline had ever happened?

A. I don't know if I completely understand your question.

Q. Okay.

A. The nonrenewal process has to do with the needs of the university. It's not linked to disciplinary actions or not. A disciplinary action is separate from a nonrenewal --

Q. Well, wait a minute, because your testimony earlier was that the nonrenewal was because of the need for his research and -- and -- a personnel issue. Do you remember that testimony?

A. My testimony basically said he was not renewed due to -- due to the fact that he was -- his services were no longer needed by the university.

Q. No. You literally testified under oath that it was because of this -- the research wasn't needed and -- and I wrote it down -- personnel issues. So how do you square that? Do you want to change your testimony?

A. My testimony -- let me be specific about what I said. My testimony was he was -- he was moved to a new position because of the personnel issues, and that position was no longer needed by the university.

That's my understanding, anyway.

Q. Okay. Did you understand, based on the packet that Dr. Park submitted, and coupled with his presentation to you, the point that he was making in his presentation was that, contrary to what you had stated, that nonrenewal is nondisciplinary -- that's your position, right?

A. Correct.

Q. Okay. How could the nonrenewal be nondisciplinary if it was predetermined?

MR. KERI: Form.

THE WITNESS: Brian, what does that mean?

MR. KERI: I just objected to the form. You can answer the question.

THE WITNESS: Can you repeat the question again?

MR. DICKENS: Okay. Celena, can you repeat what I asked.

(The requested portion was read back by the court reporter.)

THE WITNESS: The renewal was -- the -- I'm sorry. I'm confused by the question. Can you reframe it?

BY MR. DICKENS:

Q. So you did understand that Dr. Park wasn't --

wasn't saying that the nonrenewal was disciplinary, right?

A. So, my understanding, he had grieved the nonrenewal process. And there was nothing done incorrectly in the nonrenewal process, from my understanding, which is why I did not -- that's why it got passed to a level two grievance.

Q. As you understand it -- and I want to make sure that I -- I understand what you know to be the process here. As you understand it, is an accusation of predetermination of nonrenewal actionable?

A. Can you send the exhibit to me that you're talking about, this email, so that I can recall the details of it? It's been a while --

Q. No. I'm just asking you what is -- if that is a -- a viable or an actionable complaint.

A. So when we -- let me just describe the nonrenewal process. So when we look at nonrenewals, we are looking at what are the needs of the organization and do we have the work for these people to do, effectively, in the organization. And if we don't have the work for them to do, then we don't renew them. And that could be for any number of reasons why we no longer are able to have them work in the organization.

Q. Okay. Is it your testimony that an

accusation of a predetermination, that's not actionable?  That's not something that you have to attend to?

A.    I guess I'm not understanding the context of your question.  Can I see the -- the email that you're referring to so I can recall the context of it?

Q.    The question doesn't have to do with the email.  I'm asking you specifically about predetermination.  What is your understanding of an accusation of predetermination?

A.    Can you explain what you mean by a predetermination of accusation?

Q.    So, in other words, Dr. Park is alleging that his outcome was predetermined before anything ever happened, and the outcome was that Florida State University, okay -- what they wanted to happen was fire him.  And they made that determination long before they had finished the whole entire process, because, again, as you stated on the record, part of that nonrenewal was necessarily a contemplation of, as you said it, personnel issues --

MR. KERI:  Form.

BY MR. DICKENS:

Q.    Which is necessarily -- when you say personnel issues, you're clearly talking about the

reprimand that you just reviewed from June 21st of 2023, right?

MR. KERI: Form.

BY MR. DICKENS:

Q. You can answer.

A. I just am completely confused by what you're asking me, Mr. Dickens. I apologize.

Q. When you said personnel issues --

A. Mm-hm.

Q. -- clearly what you were contemplating was, at least in part, that reprimand from June 21st of 2023 because it necessarily involved personnel issues, correct?

MR. KERI: Form.

A. The -- well, this particular memo that you showed me here basically is documenting personnel issues, correct.

Q. Okay. All right. And so when you stated earlier on the record that the nonrenewal had to do with that his research wasn't needed at the institution anymore and personnel issues, that's the question that I'm asking you about predetermination of nonrenewal, before -- at least the part of what your consideration was, which is the personnel issues, before that part had even been decided.

MR. KERI: Form.

A. I guess the question I have about this, just to make sure I'm answering the question correctly, is -- you know, there's -- there's the need for a job, and there's the personnel issues that have led to basically a certain individual needing to be at a certain job because they can't work with students anymore because that has not worked out, and -- and it isn't so much the research. It's -- it's that this person can't work with other people effectively in said job, so we don't have the quantity of work for said person to -- to do the job.

Q. And what led to him having to do that other job necessarily was this, quote/unquote, personnel issue that arose, correct?

MR. KERI: Form.

A. We were giving him an opportunity to do other work because he could not work with the people he was working with before --

Q. Okay. So --

A. -- is my understanding. Again, I was not here at the time all of this took place, to be clear.

Q. Okay. What was your understanding about why he went to the new job?

A. What's -- the new job?

Q. Mm-hm.

A. I mean, it's because he couldn't work with the students and he was hostile towards all these students. And so that's why he wasn't -- you know, we had to try to find work for him where he didn't have to work with students at a university.

Q. So the personnel issue is what led to the new -- to putting him in a different position, correct?

A. Correct.

Q. Okay. So you had -- and I want to make sure that I, again, am on the same page as you are. You brought up this allegation that he was hostile towards students. Anything else?

A. That is what -- you know, what I recall, that he was -- he was just not -- not -- I mean, this is considered unacceptable behavior at this lab, to be hostile towards other people, to be hostile especially towards students at FSU University is absolutely not allowed, I mean, as documented in this document that you're showing me here.

Q. I understand that, but did you read the statements of those students?

A. No, I don't believe that I read the statements of the students. I don't think that was part of the document. Or I don't recall it if I did.

Q. Okay.

A. But that was not what the -- I just want to be very clear. The type one grievance was just about the nonrenewal. That's it.

Q. Okay.

A. Not about the -- not about this -- all of this stuff here, okay? It was about the nonrenewal process.

Q. So I'm guessing, then, it would shock you to learn that not one, single, solitary one of those students said that he was hostile towards them?

MR. KERI: Form.

BY MR. DICKENS:

Q. Go ahead.

A. So I have to answer the question?

Q. Mm-hm.

MR. KERI: Yes.

A. I -- I am surprised, yes.

Q. Okay. All right. In fact, several of the students said he never yelled, he never cussed, and he was generally calm. Is that surprising to you?

MR. KERI: Form.

A. I think you can berate and criticize people, as it says in this statement, without yelling and screaming at them. You can be passive-aggressive, for

example.

Q.    Okay.

A.    And I see that a lot at universities.  And --

Q.    Tell me -- tell me what your definition of hostility is?

A.    Hostility is an environment in which you feel uncomfortable to work, that somebody is making you feel uncomfortable, that they're not -- they're not recognizing your good work, that they're not -- you know, they're making you feel uncomfortable.  And that can happen -- it can happen by yelling and screaming, I agree, but it also can happen by, you know, making a remark or something, you know.

So I haven't seen the remarks of the students, so I really can't comment on the whole thing.

Q.    Okay.  How long have you been in academia?

A.    I have only been in academia -- well, almost two years now, back in academia.  I mainly was in industry and at National Labs.  And then as a graduate student, I was in academia for four years.

Q.    Okay.  And I just want to make sure, in your experience in academia, it's a pretty stressful environment, isn't it?

A.    I would say that all three environments that I've worked in have been equally stressful but in

slightly different ways.

Q. Okay. But academia is actually stressful, correct?

A. I think most jobs are stressful. But, yes, academia is stressful.

Q. Okay.

A. Working at GE was stressful, and working at Brookhaven National Labs was stressful. So --

Q. Okay. All right.

A. Okay? Just to be clear. I don't differentiate between the three, okay?

Q. Right, but I'm -- I'm just making sure that you understand that there's not something magical about the Florida State University. And I'm a graduate there, okay?

A. Uh-huh. Yep. No.

Q. So I'm -- I --

A. I understand that, yes. Yes, sir, I understand that.

Q. I take this position to heart. There's not something magical about the Florida State University that somehow or other makes that pursuit of a degree not stressful, right?

A. Correct.

Q. All right. By the nature of that pursuit,

it's going to be a stressful environment. I'm not saying that everybody went through law school. I'm not saying everybody that went to medical school or got their Ph.D. You had different experiences. But what I'm saying is, overall, it's a pretty stressful situation, right?

A. As a Ph.D. student; is that what you're asking me?

Q. I'm saying your experiences in education altogether, whether it was your undergraduate degree, your doctorate. It --

A. Well, it was -- it was stressful, but I'll say that some of my best years were actually at the University of Toronto and at Florida State University as a graduate student. I had a very nurturing environment where people treated me with respect. I was allowed to write papers as first author. I had a great team I worked with here. So that was a very positive experience for me.

I would say it was probably less stressful than working at GE, working as the director of the Magnet Lab, or working at Brookhaven, just to be very honest.

Q. Okay. How long did you meet with Dr. Park?

A. About one hour, I believe. It was at least

one hour.

Q.   Okay.  I'll share with you -- do you know who Dr. James Clark is?

A.   Yes.  He's the provost of the university.

Q.   I took his deposition yesterday and -- and I'm just -- I'm using a quote here.  He said his experience was, "I found him to be polite and totally appropriate."

Did you have any experience different than what Dr. James Clark had?

A.   No.  I found -- I found Dr. Park to be very polite.  No problems in my -- in my discussion with him, absolutely.  He answered any questions that I had during the discussion.

Q.   Okay.  And you certainly found him, during your interaction, not to be abusive, correct?

A.   Correct.

MR. KERI:  Form.

BY MR. DICKENS:

Q.   All right.  And not to be aggressive, correct?

MR. KERI:  Form.  You can answer.

THE WITNESS:  I can answer?  Okay.

MR. KERI:  Yeah, go ahead and answer.

THE WITNESS:  Correct.  Yes, correct.

BY MR. DICKENS:

Q. All right. And also found him not to be hostile, correct?

THE WITNESS: It's okay to answer, Brian?

MR. KERI: Yes, yes. Form.

THE WITNESS: Correct. Yes.

MR. DICKENS: Okay. All right. I'm going to take a short break. Let's come back at noon and finish up.

(Recess from 11:51 a.m. to 12:12 p.m.)

BY MR. DICKENS:

Q. All right. We'll go ahead and finish up here. Dr. Amm, we -- previously, we were talking about Dr. Park's -- Dr. Park's grievance procedure --

A. Yes.

Q. -- and your -- your response to the grievance of the nonrenewal.

A. Yes.

Q. You're familiar with the Collective Bargaining Agreement, right?

A. Correct. Yes.

Q. Okay. And let me ask you, what is your understanding of the progressive discipline process in the CBA?

A. Well, there's -- there's a -- you mean the

grievance filing process? Is that what you're asking about or --

Q. No. I'm -- what is your -- what is progressive discipline?

A. Oh, progressive discipline. Okay. So when somebody -- when somebody has an action that, you know, is significant enough to -- well, first of all, if you -- if you have, you know, a performance issue with an employee, you work very close -- especially -- let me talk about faculty first, since we're talking about faculty.

We speak with -- we report to HR and work with them on what the appropriate response is to the employee. And if it's serious enough, then there will be a letter of reprimand written about the event that transpired or this type of thing to go into an employee's file. And then it may -- it will also be documented in their appraisal, whatever the issue was, as well, in the written portion of the appraisal.

And if there's multiple things that happen, there can be another letter filed that could be much more serious, taking actions on what the employee did. And typically, also, there can be, if it's serious enough, right -- if somebody has something very, very serious, then it can lead to the termination of the

employee.

Q. Okay. And you understand Dr. Park to be -- to be party to the CBA, correct?

A. Yes. He's research faculty, so, yes, he falls under the CBA.

Q. Okay. And tell me, as you understand it, what are the steps of the progressive discipline process?

A. I thought I just told you the steps of the progressive discipline process.

Q. Well, you said a lot of words. I didn't understand that was what you were saying to me.

A. Okay. Well, I can pull up --

MR. KERI: Form. Hold on. No, there's no question.

THE WITNESS: Okay.

MR. KERI: Let him ask you a question.

BY MR. DICKENS:

Q. You can pull something up. What is it?

A. Well, the CBA document. We can look at exact --

Q. Sure. I'll send it to you.

A. If you're asking precisely what the procedure is, we can follow exactly what the procedure is. I mean, that's what I would do in every case, is go refer

to that and also work with the HR department here at FSU to make sure that I'm following all the guidelines very carefully, because it's a very serious thing when there's a disciplinary action.

Q. Right. So what I'm trying to gauge is your understanding of how progressive discipline works. And if I could summarize, it is -- it starts --

A. I'll say document --

MR. KERI: Hold on. There's no question.

THE WITNESS: Okay.

BY MR. DICKENS:

Q. I'm asking you, tell me where it starts with and then ends with. You can answer.

A. In my perspective? Yes. Okay. So when -- you know, typically, if you're starting -- you know, you'll have people that will come and talk to you and complain about things or you'll notice how the person is not performing technically, if it's a technical issue. You know, you document those -- those items, and you talk to the employee and provide coaching to them to help them, you know, with that.

And if that doesn't improve and it continues to escalate, then you doc -- like I said, you document it with a written reprimand in the file that is provided to them to document what occurred and any

actions that are taken as a consequence of that.

Q. Okay. And so it's a stepwise process, correct?

A. It --

MR. KERI: Form.

THE WITNESS: Sorry. Yes.

MR. KERI: Okay.

BY MR. DICKENS:

Q. You don't have to stop every time he says "form." It just means that he's putting an objection on the record.

A. This is the first time I have ever been deposed, okay? So I'm worrying, okay?

Q. Well, I'm just telling you, when he says "form," you don't have to stop, and you can --

A. It just -- I just don't want to screw anything up. I want to do everything right and saying the truth and nothing but the truth. So that's why I'm being very careful with my choice of words.

So the question -- I guess the question -- the thing is, it depends. If somebody does something very serious where they're incredibly violent, you know, there may be -- I've seen instances -- not that I've experienced it or done it myself, but there are instances where people are immediately removed from

their position when it's very, very serious, right?  If they're shooting people or whatever.  I mean, it depends, right?

Q.   Mm-hm.

A.   So I don't want to be general here.

Q.   Okay.

A.   But there is a written process that we follow very, very carefully for -- for faculty, you know, per the CBA.  We follow that -- that thing.

Q.   Tell me situations that you are aware of where someone has been terminated immediately?

A.   I have not myself experienced a situation where somebody has been terminated immediately.

Q.   Okay.  Are you aware of situations where someone could be terminated immediately, under the progressive discipline rules in the CBA?

A.   Let me just pull it up, because I don't want to -- I refer to it when I'm looking at these things, okay?  I don't have it memorized off of the top of my head, to be clear.

Q.   Mm-hm.

MR. KERI:  Hold on.  The answer was given, so I want to advise Dr. Amm, if you don't know the answer to a question, you just say you don't know.

THE WITNESS:  Okay.

APEX REPORTING, INC.     TALLAHASSEE, FLORIDA     850-597-5185

MR. KERI: You don't have to pull up records. There's nothing on your screen. Counsel has not asked this to be a deposition duces tecum. So you're not required to look at documents unless Counsel provides them to you. So if you don't know, that's fine.

THE WITNESS: Okay. I don't know the answer, then.

BY MR. DICKENS:

Q. All right. So just making sure that we are all on the same page, you do know what progressive discipline is, correct?

A. Correct.

Q. Okay. And you do understand that progressive, by nature of the name, means it -- it continues -- or it goes in a continual fashion, correct?

A. Yes. Yes.

Q. Okay. And it is ascending, in that it starts at the lowest form of discipline and then continues to go up when behavior, for instance, doesn't change, ultimately ending in termination. Is that a correct statement?

A. Yes.

Q. Okay. Understanding that there are

situations where someone could engage in theft, for instance, or murder or something really horrific --

A. Correct.

Q. -- and then, bam, they're fired right then, right?

A. Correct.

Q. Okay. Termination is, in the progressive discipline rule -- is the last thing that the university will do, correct?

MR. KERI: Form.

BY MR. DICKENS:

Q. Whether it is -- whether it happens to be because, oh, you murdered somebody so you're fired or it's because, okay, we're going to start with a written reprimand, then we're going to do a suspension, then we're going to do a suspension without pay, now we're going to terminate you. Under any analysis, termination is the final part of progressive discipline, right?

MR. KERI: Form.

A. Yes, as far as I understand it. Yes, that's the last thing --

Q. Okay.

A. -- that people can do to you is fire you. Then you're gone.

Q.   Okay.  So you understand, then, what Dr. Park's position was -- when he presented to you was that, unless I've engaged in one of those things that would warrant immediate termination, i.e. I stole from FSU, I beat someone up at FSU -- unless he had engaged in one of those things, predetermining an outcome of termination violates the CBA.  You understand that, right?

MR. KERI:  Form.

A.   Predetermination.  So, I mean, you have to follow the -- the -- you know, the disciplinary policy to terminate somebody, but this was a nonrenewal.  This was not a termination.

Q.   Yeah, I understand.  But he doesn't work there -- or he will not be working there anymore in August, right?

A.   Correct.

Q.   Okay.  So, I mean -- I mean, it's the old saying of "If it walks like a duck and quacks like a duck, it's a duck."  No matter what, whether you call it a termination or you call it a nonrenewal, he ain't working there anymore, right?

A.   Correct.  He will not be working here --

MR. KERI:  Form.

THE WITNESS:  -- after August, yes.

BY MR. DICKENS:

Q. Exactly. Exactly. And so I get it that the university wants to stand on this narrative that, oh, no, it's just a nonrenewal. But the CBA allows him to refute that nonrenewal with evidence that you violated the CBA, i.e. you contemplated nonrenewing me before you had even given me -- or you contemplated getting me out of here, terminating me, making sure that I no longer work here before you even went through the process.

A. So --

MR. KERI: Hold on. There's no question pending yet.

BY MR. DICKENS:

Q. Go ahead and answer.

MR. KERI: What's the question? You just did a pretty long colloquy. I don't know what the question was.

MR. DICKENS: Celena, can you read back what I just said? And, Brian, you've got to stop interrupting.

MR. KERI: I'm not interrupting. I'm objecting.

MR. DICKENS: Just to form. That's it. Form. Not, oh, wait a minute, what even is the

question?  She was getting ready to answer.  Stop directing her on how to answer.

MR. KERI:  I didn't think there was a question pending, Counsel.

MR. DICKENS:  Just say "form" and then leave it, because she was starting to answer.  So now what you're doing is you are engaging in the direction of her testimony.

MR. KERI:  I'm not engaging in the direction. I didn't -- I didn't hear --

MR. DICKENS:  You know that you are supposed to object to form and leave it.

MR. KERI:  Counsel, I didn't hear a question. That was my concern.  And the way you -- you didn't trail off as if there was a question.  You like making statements.  I'm not saying anything to that.  I'm objecting to the form.

MR. DICKENS:  Then you say "form."  That's it.

MR. KERI:  I didn't hear a question.

MR. DICKENS:  Just say "form," Brian.

MR. KERI:  I didn't think you were done yet.

MR. DICKENS:  Brian, we got to make sure we're at least on the same page.

MR. KERI:  We're on the same page --

MR. DICKENS: You know the proper way to object. Whether it sounds --

MR. KERI: Counsel, Counsel --

MR. DICKENS: -- good or not to you, the way to object is you just say "form" --

MR. KERI: Counsel, please don't --

MR. DICKENS: -- or "object to form." You don't add in your soliloquy about why you don't like the way that I am asking.

MR. KERI: Okay. Well, I didn't say that, and it's pretty clear on the record. It didn't seem like you were done and there was even a question posed there yet. I'm not making any comment on the quality of your question. There wasn't a question there.

I didn't -- and there were several times where the witness started saying things before you were done with a question. I thought that was going on right here. That's all I'm doing. I'm not saying anything other than it didn't sound like you had a question there.

MR. DICKENS: And so you can say "form." If you don't like the way that I have asked, then you say form.

MR. KERI: Form is --

MR. DICKENS:  Can we at least --

MR. KERI:  Look.

MR. DICKENS:  -- come to that agreement?

MR. KERI:  Let's just --

MR. DICKENS:  That the proper way to object is by saying "form."  Can we at least --

MR. KERI:  Please be circular.  My point was it didn't sound like you had a question there. That's all.  How do I object to the form if it's not a question?  You're making a lot of statements, and that's --

MR. DICKENS:  I know, because you don't -- you don't agree with the form --

MR. KERI:  No.

MR. DICKENS:  -- of my question.

MR. KERI:  I didn't think --

MR. DICKENS:  For instance, my inflection isn't the right inflection that you like to hear --

MR. KERI:  Counsel, you're putting a lot of words in my mouth that are just simply untrue.  I just did not hear a question.

MR. DICKENS:  There's only one word that I need to hear from you:  Form.  That's it.

MR. KERI:  There was no question.  I didn't

APEX REPORTING, INC.    TALLAHASSEE, FLORIDA    850-597-5185

hear a question.

MR. DICKENS:  I -- I give you that same professional courtesy every single time.

MR. KERI:  You're suggesting I'm being discourteous here, Counsel.  I'm not.  I didn't hear a question, and that -- I'm sorry if I didn't hear a question.  I was trying to make it clear.

MR. DICKENS: Okay.  Yeah.  Form.  Form is sufficient.  That's what the rule says.  Form is sufficient.

BY MR. DICKENS:

Q.   Dr. Amm, you do understand that a defense to the nonrenewal is violation of the CBA, right?

MR. KERI:  Form.

A.   A defense to the nonrenewal.  Say that again. It just didn't make sense to me.

Q.   So if someone is being nonrenewed, they can form a --

A.   Yes.

Q.   -- or they can file a grievance, right?

A.   Correct.  Yes, absolutely.

Q.   So a defense against that nonrenewal is to say you violated the CBA, right?

A.   Yes.  Correct.

Q.   And so if someone's -- it doesn't say what in

the CBA. It doesn't say, oh, but you can only say, you know, Section 15 was violated or Section 2 was violated. It says any violation of the CBA is a defense to being nonrenewed. You understand that, right?

MR. KERI: Form.

A. A defense -- so, basically, they -- let me just -- can I rephrase?

Q. You can file a grievance --

A. Yes.

Q. -- and say -- and that grievance can be supported if any provision of the CBA had been violated, correct?

MR. KERI: Form.

A. I believe so, yes.

Q. Okay. All right.

A. That's my understanding, but --

Q. So it stands to reason that if Dr. Park says, Dr. Amm, they violated the CBA and then specifically states that the violation of the CBA is a failure to follow Paragraph or Section 16 for progressive discipline, that is something that you have to entertain, correct, in that review of the grievance process?

A. Correct.

Q.   Okay.

A.   Can I ask how much longer this is going to go on?  I have another meeting, and I need to let people know if I'm not going to be there.  We're now into an hour -- or hour and a half of time, and I was booked for an hour.

Q.   Is it your position, Dr. Amm, that Dr. Park provided you with no evidence that his right to progressive discipline had been violated?

A.   I saw no evidence in the information that Dr. Park provided that said his progressive discipline had been violated.

Q.   And by "evidence," that includes his testimony to you in that Zoom meeting?

A.   Correct.

Q.   And so you're saying that he had no evidence, whether it was documentation or in the words that he said during that Zoom meeting, that his right to progressive discipline was violated?

A.   Yes.  Correct.

Q.   Was that Zoom meeting recorded?

A.   I do not recall if it was recorded.

Q.   Did you take notes during that Zoom meeting?

A.   I don't think I did.

MR. DICKENS:  All right.  That's all I got.

MR. KERI:  All right.  Dr. Amm, I have a brief question or two.

                    EXAMINATION

BY MR. KERI:

Q.   In relation to the step one grievance that Dr. Park filed, did you issue written findings on December 19, 2024?

A.   December 19, 2024.  I believe -- I think it was -- I think it was a year ago that this happened.  I think it may have been 2025, but I'm not totally sure.

Q.   Okay.  If there's a document that you signed, dated December 19, 2024, regarding --

A.   That -- it may be 2024.  It's been so long, I can't remember the exact date, to be honest.

Q.   Okay.  And regardless of the date --

A.   Okay.

Q.   -- at one point you issued written findings, correct?

A.   Yes.  Correct.

MR. KERI:  Okay.  That's all the questions I have.

MR. DICKENS:  All right.

MR. KERI:  You good?

MR. DICKENS:  Yep.

MR. KERI:  Okay.  Dr. Amm, thank you.  You're

free to go.  The witness will read.

THE WITNESS:  Okay.  Thank you very much.

(Deposition concluded at 12:35 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA )

COUNTY OF DUVAL )

I, Celena Rodriguez, Registered Professional Reporter, Notary Public, State of Florida, certify that KATHLEEN AMM appeared before me via videoconference, Zoom, on the 27th of March, 2026, and was duly sworn.

Signed this 16th day of April, 2026.

_____
Celena Rodriguez, RPR
Registered Professional Reporter
Notary Public, State of Florida

My Commission # HH266235
Expires: May 23, 2026

APEX REPORTING, INC.    TALLAHASSEE, FLORIDA    850-597-5185

CERTIFICATE OF REPORTER

STATE OF FLORIDA  )

COUNTY OF DUVAL   )

I, CELENA RODRIGUEZ, Registered Professional Reporter, do hereby certify that I was authorized to and did stenographically report the deposition of KATHLEEN AMM; that a review of the transcript was requested; and that the foregoing transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 16th day of April, 2026.


_____
Celena Rodriguez, RPR
Registered Professional Reporter

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

WAN KYU PARK,

                                    CASE NO. 4:25-cv-0267-MW/MJF

          Plaintiff,

v.

FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, LAURA
GREENE, ERIC PALM, REBECCA
PETERSON, and JAMES CLARK,
in both their official and
individual capacities,

          Defendants.
_____/

IN RE:  DEPOSITION OF KATHLEEN AMM

TAKEN:  MARCH 27, 2026

DATE SENT TO WITNESS:  APRIL 16, 2026

TO:  KATHLEEN AMM
     C/O BRIAN KERI, ESQ.

          The referenced transcript has been completed and is being emailed to you for reading and signing purposes.

          Upon receipt, please print the Errata Sheet and make any and all corrections on the Errata Sheet. Please return the Errata Sheet via mail or email to apexreportingservices@gmail.com to our office within 30 days from receipt of this email.

          The original of this deposition has been forwarded to the ordering party and your errata, once received, will be forwarded to all ordering parties.

          Thank you.

_____
CELENA RODRIGUEZ, RPR

APEX REPORTING, INC.     TALLAHASSEE, FLORIDA     850-597-5185

48

ERRATA SHEET

PAGE/LINE NO.          EXPLANATION FOR CORRECTION

----- ------------------------------

----- ------------------------------

----- ------------------------------

----- ------------------------------

----- ------------------------------

----- ------------------------------

----- ------------------------------

----- ------------------------------

----- ------------------------------

----- ------------------------------

----- ------------------------------

STATE OF FLORIDA          )

COUNTY OF _____    )

        I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

        EXECUTED this _____ day of _____, 2026, at _____, _____.

_____
KATHLEEN AMM

## 1

**11:51** [1] - 27:10
**12:12** [1] - 27:10
**12:35** [1] - 44:3
**15** [1] - 41:2
**16** [1] - 41:21
**19** [4] - 6:15, 43:7, 43:8, 43:12
**1998** [1] - 6:1

## 2

**2** [1] - 41:2
**2018** [1] - 6:18
**2018/'17** [1] - 6:16
**2023** [7] - 11:5, 12:7, 13:20, 13:22, 14:6, 19:2, 19:11
**2024** [5] - 7:10, 43:7, 43:8, 43:12, 43:13
**2025** [1] - 43:10
**21st** [5] - 12:7, 13:20, 13:22, 19:1, 19:11
**24** [1] - 11:5

## 3

**30** [1] - 7:3

## A

**a.m** [1] - 27:10
**able** [1] - 17:24
**absolutely** [4] - 11:2, 21:18, 26:13, 40:21
**abusive** [1] - 26:16
**academia** [7] - 23:16, 23:17, 23:18, 23:20, 23:22, 24:2, 24:5
**Academy** [1] - 5:9
**accusation** [4] - 17:10, 18:1, 18:10, 18:12
**acknowledged** [1] - 4:7
**action** [3] - 15:8, 28:6, 30:4
**actionable** [3] - 17:11, 17:16, 18:2
**actions** [4] - 14:19, 15:8, 28:22, 31:1
**activities** [1] - 7:19
**add** [1] - 38:8
**addition** [1] - 8:24
**address** [1] - 11:12
**advanced** [1] - 6:8
**advise** [1] - 32:23
**aggressive** [2] - 22:25, 26:20
**Agnes** [1] - 5:9
**ago** [2] - 10:15, 43:9
**agree** [2] - 23:12, 39:13
**agreement** [1] - 39:3
**Agreement** [1] - 27:20

**ahead** [5] - 12:19, 22:14, 26:24, 27:12, 36:15
**ain't** [1] - 35:21
**Albany** [1] - 6:6
**allegation** [1] - 21:12
**alleging** [1] - 18:13
**allowed** [2] - 21:19, 25:17
**allows** [1] - 36:4
**almost** [1] - 23:17
**altogether** [1] - 25:10
**AMM** [1] - 4:6
**Amm** [10] - 4:12, 4:22, 4:24, 27:13, 32:23, 40:12, 41:19, 42:7, 43:1, 43:25
**analysis** [1] - 34:17
**answer** [18] - 10:4, 11:14, 14:16, 16:14, 19:5, 22:15, 26:22, 26:23, 26:24, 27:4, 30:13, 32:22, 32:24, 33:7, 36:15, 37:1, 37:2, 37:6
**answered** [1] - 26:13
**answering** [1] - 20:3
**anticipated** [1] - 6:21
**anyway** [1] - 16:1
**apologize** [1] - 19:7
**appraisal** [2] - 28:18, 28:19
**appropriate** [2] - 26:8, 28:13
**April** [1] - 14:6
**area** [2] - 6:6, 9:4
**arose** [1] - 20:15
**ascending** [1] - 33:19
**attend** [1] - 18:3
**attorney** [1] - 4:13
**August** [2] - 35:16, 35:25
**author** [1] - 25:17
**aware** [7] - 7:24, 12:3, 12:5, 12:6, 13:10, 32:10, 32:14

## B

**bam** [1] - 34:4
**Bargaining** [1] - 27:20
**based** [3] - 8:21, 16:2
**beat** [1] - 35:5
**became** [2] - 7:9, 8:11
**beginning** [1] - 6:1
**behavior** [2] - 21:16, 33:21
**berate** [1] - 22:23
**best** [1] - 25:13
**between** [1] - 24:11
**Bobinger** [2] - 7:12, 7:13
**booked** [1] - 42:5
**born** [2] - 4:25, 5:3
**Boston** [2] - 5:3, 5:4
**break** [1] - 27:8
**Brian** [6] - 14:14, 16:12, 27:4, 36:20, 37:21, 37:23
**brief** [1] - 43:2
**briefed** [2] - 8:12, 8:14

**briefing** [1] - 8:16
**briefly** [1] - 8:14
**Brookhaven** [4] - 6:22, 7:2, 24:8, 25:22
**brought** [2] - 9:15, 21:12
**BY** [20] - 4:11, 10:12, 13:7, 14:21, 16:24, 18:23, 19:4, 22:13, 26:19, 27:1, 27:11, 29:18, 30:11, 31:8, 33:9, 34:11, 36:1, 36:14, 40:11, 43:4

## C

**calm** [1] - 22:21
**cannot** [1] - 10:14
**careful** [1] - 31:19
**carefully** [2] - 30:3, 32:8
**case** [1] - 29:25
**Catholic** [1] - 5:11
**CBA** [16] - 27:24, 29:3, 29:5, 29:20, 32:9, 32:16, 35:7, 36:4, 36:6, 40:13, 40:23, 41:1, 41:3, 41:12, 41:19, 41:20
**celena** [1] - 36:19
**Celena** [2] - 4:1, 16:17
**certain** [2] - 20:6, 20:7
**certainly** [1] - 26:15
**change** [2] - 15:20, 33:21
**chat** [3] - 12:16, 12:17, 12:22
**choice** [1] - 31:19
**circular** [1] - 39:7
**Clark** [2] - 26:3, 26:10
**clear** [7] - 4:19, 20:22, 22:3, 24:10, 32:20, 38:11, 40:7
**clearly** [2] - 18:25, 19:10
**click** [1] - 12:16
**close** [1] - 28:9
**coaching** [1] - 30:20
**Collective** [1] - 27:19
**college** [1] - 5:16
**colloquy** [1] - 36:17
**comment** [3] - 11:10, 23:15, 38:14
**company** [1] - 6:7
**complain** [1] - 30:17
**complaint** [1] - 17:16
**completely** [2] - 15:3, 19:6
**concern** [1] - 37:14
**concluded** [1] - 44:3
**condensed** [1] - 5:23
**confused** [2] - 16:22, 19:6
**consequence** [1] - 31:1
**consideration** [1] - 19:23
**considered** [1] - 21:16
**contemplated** [2] - 36:6, 36:7
**contemplating** [1] - 19:10

**contemplation** [1] - 18:20
**content** [1] - 9:8
**context** [2] - 18:4, 18:6
**continual** [1] - 33:16
**continues** [3] - 30:22, 33:16, 33:20
**contrary** [1] - 16:5
**Correct** [1] - 26:25
**correct** [45] - 8:13, 9:23, 9:24, 10:20, 11:13, 12:4, 12:7, 12:10, 13:12, 14:4, 16:8, 19:13, 19:17, 20:15, 21:8, 21:9, 24:3, 24:24, 26:16, 26:17, 26:21, 26:25, 27:3, 27:6, 27:21, 29:3, 31:3, 33:12, 33:13, 33:17, 33:22, 34:3, 34:6, 34:9, 35:17, 35:23, 40:21, 40:24, 41:13, 41:23, 41:25, 42:15, 42:20, 43:18, 43:19
**correctly** [1] - 20:3
**counsel** [8] - 33:2, 33:5, 37:4, 37:13, 38:3, 38:6, 39:20
**Counsel** [1] - 40:5
**coupled** [1] - 16:3
**court** [1] - 16:20
**courtesy** [1] - 40:3
**criticize** [1] - 22:23
**cryogenic** [1] - 6:8
**cussed** [1] - 22:20

## D

**date** [8] - 10:14, 12:8, 12:10, 13:17, 13:24, 43:14, 43:15
**dated** [1] - 43:12
**December** [3] - 43:7, 43:8, 43:12
**decided** [1] - 19:25
**defense** [5] - 40:12, 40:15, 40:22, 41:4, 41:7
**definition** [1] - 23:4
**degree** [2] - 24:22, 25:10
**degrees** [1] - 5:21
**demanding** [1] - 4:16
**department** [1] - 30:1
**deposed** [1] - 31:13
**Deposition** [2] - 4:1, 44:3
**deposition** [3] - 4:17, 26:5, 33:3
**describe** [1] - 17:17
**details** [1] - 17:14
**determination** [1] - 18:17
**DICKENS** [46] - 4:11, 10:12, 12:23, 13:1, 13:7, 14:21, 16:17, 16:24, 18:23, 19:4, 22:13, 26:19, 27:1, 27:7, 27:11, 29:18, 30:11, 31:8, 33:9, 34:11, 36:1, 36:14,

36:19, 36:24, 37:5, 37:11, 37:18, 37:21, 37:23, 38:1, 38:4, 38:7, 38:22, 39:1, 39:3, 39:5, 39:12, 39:15, 39:17, 39:23, 40:2, 40:8, 40:11, 42:25, 43:22, 43:24
**Dickens** [2] - 4:13, 19:7
**different** [7] - 7:18, 11:20, 14:23, 21:8, 24:1, 25:4, 26:9
**differentiate** [1] - 24:11
**direct** [1] - 7:16
**directing** [1] - 37:2
**direction** [2] - 37:8, 37:9
**director** [7] - 7:1, 7:6, 7:9, 7:11, 7:17, 8:11, 25:21
**disciplinary** [6] - 14:19, 15:8, 17:1, 30:4, 35:11
**discipline** [16] - 15:1, 27:23, 28:4, 28:5, 29:7, 29:10, 30:6, 32:16, 33:12, 33:20, 34:8, 34:19, 41:22, 42:9, 42:11, 42:19
**discourteous** [1] - 40:5
**discussing** [4] - 11:5, 14:9, 14:11, 15:1
**discussion** [2] - 26:12, 26:14
**dispute** [1] - 13:21
**division** [1] - 7:1
**doc** [1] - 30:23
**doctorate** [1] - 25:11
**document** [12] - 10:11, 10:23, 12:10, 13:14, 21:19, 21:25, 29:20, 30:8, 30:19, 30:23, 30:25, 43:11
**documentation** [3] - 10:7, 11:9, 42:17
**documented** [2] - 21:19, 28:18
**documenting** [1] - 19:16
**documents** [4] - 10:22, 11:1, 12:22, 33:4
**Dominican** [1] - 5:12
**done** [5] - 17:4, 31:24, 37:22, 38:12, 38:18
**down** [2] - 12:9, 15:19
**Dr** [54] - 4:12, 4:13, 4:22, 4:24, 7:12, 7:13, 8:1, 8:3, 8:4, 8:6, 8:10, 8:12, 8:19, 8:21, 9:1, 9:3, 9:6, 9:14, 9:23, 9:25, 10:7, 10:9, 10:10, 10:13, 10:18, 11:4, 11:6, 12:3, 13:14, 14:5, 14:6, 16:3, 16:25, 18:13, 25:24, 26:3, 26:10, 26:11, 27:13, 27:14, 29:2, 32:23, 35:2, 40:12, 41:18, 41:19, 42:7, 42:11, 43:1, 43:6, 43:25
**drafted** [1] - 11:4

**E**

**duces** [1] - 33:3
**duck** [3] - 35:19, 35:20
**due** [3] - 14:19, 15:15
**duly** [1] - 4:7
**during** [5] - 4:17, 26:14, 26:15, 42:18, 42:23
**duties** [3] - 6:25, 7:24, 9:3

**education** [1] - 25:9
**effectively** [2] - 17:21, 20:10
**either** [1] - 8:17
**email** [7] - 11:3, 11:8, 11:15, 14:5, 17:13, 18:5, 18:8
**emeritus** [1] - 7:17
**employee** [5] - 28:9, 28:14, 28:22, 29:1, 30:20
**employee's** [1] - 28:17
**ending** [1] - 33:22
**ends** [1] - 30:13
**engage** [1] - 34:1
**engaged** [3] - 7:19, 35:3, 35:5
**engaging** [2] - 37:7, 37:9
**Engineers** [1] - 7:3
**entertain** [1] - 41:23
**entire** [1] - 18:18
**environment** [4] - 23:6, 23:23, 25:1, 25:16
**environments** [1] - 23:24
**equally** [1] - 23:25
**Eric** [1] - 8:14
**Eric's** [1] - 8:17
**escalate** [1] - 30:23
**especially** [2] - 21:17, 28:9
**event** [1] - 28:15
**evidence** [5] - 36:5, 42:8, 42:10, 42:13, 42:16
**exact** [3] - 10:14, 29:21, 43:14
**exactly** [4] - 4:19, 29:24, 36:2
**EXAMINATION** [2] - 4:10, 43:3
**example** [1] - 23:1
**exhibit** [3] - 12:14, 12:15, 17:12
**experience** [4] - 23:22, 25:19, 26:7, 26:9
**experienced** [2] - 31:24, 32:12
**experiences** [2] - 25:4, 25:9
**explain** [1] - 18:11

**F**

**fact** [2] - 15:15, 22:19
**faculty** [4] - 28:10, 28:11, 29:4, 32:8
**failure** [1] - 41:20

**fairly** [1] - 10:23
**falls** [1] - 29:5
**familiar** [1] - 27:19
**far** [3] - 9:20, 9:21, 34:21
**fashion** [1] - 33:16
**February** [2] - 11:5, 14:6
**field** [1] - 7:6
**file** [4] - 28:17, 30:24, 40:20, 41:9
**filed** [2] - 28:21, 43:6
**filing** [2] - 8:9, 28:1
**final** [1] - 34:18
**findings** [2] - 43:6, 43:17
**fine** [2] - 4:23, 33:6
**finish** [2] - 27:9, 27:12
**finished** [1] - 18:18
**fire** [2] - 18:16, 34:24
**fired** [2] - 34:4, 34:13
**first** [4] - 25:17, 28:7, 28:10, 31:12
**five** [1] - 6:24
**Florida** [6] - 4:3, 5:20, 18:15, 24:14, 24:21, 25:14
**folks** [1] - 4:15
**follow** [5] - 29:24, 32:7, 32:9, 35:11, 41:21
**following** [1] - 30:2
**follows** [1] - 4:8
**form** [48] - 10:4, 11:14, 14:13, 14:16, 16:11, 16:13, 18:22, 19:3, 19:14, 20:1, 20:16, 22:12, 22:22, 26:18, 26:22, 27:5, 29:14, 31:5, 31:10, 31:15, 33:20, 34:10, 34:20, 35:9, 35:24, 36:24, 36:25, 37:5, 37:12, 37:17, 37:18, 37:21, 38:5, 38:7, 38:22, 38:24, 38:25, 39:6, 39:9, 39:13, 39:24, 40:8, 40:9, 40:14, 40:18, 41:6, 41:14
**four** [2] - 14:7, 23:20
**frame** [1] - 6:17
**free** [2] - 11:10, 44:1
**front** [1] - 13:19
**FSU** [10] - 4:14, 5:22, 5:23, 7:13, 7:15, 14:18, 21:18, 30:2, 35:5
**full** [1] - 9:8

**G**

**gauge** [1] - 30:5
**GE** [4] - 6:12, 6:14, 24:7, 25:21
**general** [1] - 32:5
**generally** [1] - 22:21
**given** [5] - 9:2, 12:11, 13:24, 32:22, 36:7
**global** [1] - 6:12

**Global** [1] - 6:14
**graduate** [5] - 5:7, 5:18, 23:19, 24:14, 25:15
**great** [1] - 25:18
**Greene's** [1] - 9:2
**Gregory** [1] - 7:12
**grievance** [23] - 8:9, 8:10, 9:15, 9:23, 10:2, 10:6, 11:15, 11:17, 11:18, 11:19, 11:20, 11:21, 13:11, 17:7, 22:3, 27:14, 27:16, 28:1, 40:20, 41:9, 41:11, 41:23, 43:5
**grieved** [1] - 17:3
**guess** [3] - 18:4, 20:2, 31:20
**guessing** [1] - 22:9
**guidelines** [1] - 30:2
**gypstack** [1] - 7:20

**H**

**half** [1] - 42:5
**head** [1] - 32:20
**hear** [11] - 9:13, 14:14, 37:10, 37:13, 37:20, 39:19, 39:22, 39:24, 40:1, 40:6, 40:7
**heard** [1] - 9:12
**heart** [1] - 24:20
**help** [1] - 30:21
**high** [4] - 5:4, 5:6, 5:7, 7:6
**hired** [1] - 6:12
**hm** [7] - 12:2, 14:8, 19:9, 21:1, 22:16, 32:4, 32:21
**hold** [4] - 29:14, 30:9, 32:22, 36:12
**honest** [2] - 25:23, 43:14
**horrific** [1] - 34:2
**hostile** [6] - 21:3, 21:12, 21:17, 22:11, 27:3
**hostility** [2] - 23:5, 23:6
**hour** [6] - 10:17, 25:25, 26:1, 42:5, 42:6
**Houston** [1] - 5:6
**HR** [2] - 28:12, 30:1

**I**

**i.e** [2] - 35:4, 36:6
**Illinois** [1] - 5:19
**immediate** [1] - 35:4
**immediately** [4] - 31:25, 32:11, 32:13, 32:15
**impossible** [1] - 9:6
**improve** [1] - 30:22
**included** [2] - 11:8, 14:5
**includes** [1] - 42:13
**incorrectly** [1] - 17:5
**incredibly** [1] - 31:22
**indicated** [1] - 14:3
**individual** [1] - 20:6

**industry** [1] - 23:19
**inflection** [2] - 39:17, 39:18
**information** [3] - 10:1, 10:11, 42:10
**instance** [3] - 33:21, 34:2, 39:17
**instances** [2] - 31:23, 31:25
**institution** [1] - 19:20
**insulation** [2] - 6:7, 6:8
**interaction** [1] - 26:16
**interrupting** [2] - 36:21, 36:22
**interview** [2] - 9:23, 10:6
**involved** [1] - 19:12
**issue** [7] - 15:12, 20:15, 21:7, 28:8, 28:18, 30:19, 43:6
**issued** [5] - 12:7, 13:22, 14:7, 14:12, 43:17
**issues** [12] - 9:1, 9:5, 15:19, 15:24, 18:21, 18:25, 19:8, 19:12, 19:17, 19:21, 19:24, 20:5
**it'll** [1] - 13:2
**items** [1] - 30:19

## J

**James** [2] - 26:3, 26:10
**job** [8] - 6:5, 20:4, 20:7, 20:11, 20:12, 20:14, 20:24, 20:25
**jobs** [1] - 24:4
**June** [7] - 12:7, 13:18, 13:20, 13:22, 14:6, 19:1, 19:11

## K

**KATHLEEN** [1] - 4:6
**KERI** [59] - 10:4, 11:14, 12:20, 14:13, 14:16, 16:11, 16:13, 18:22, 19:3, 19:14, 20:1, 20:16, 22:12, 22:17, 22:22, 26:18, 26:22, 26:24, 27:5, 29:14, 29:17, 30:9, 31:5, 31:7, 32:22, 33:1, 34:10, 34:20, 35:9, 35:24, 36:12, 36:16, 36:22, 37:3, 37:9, 37:13, 37:20, 37:22, 37:25, 38:3, 38:6, 38:10, 38:25, 39:2, 39:4, 39:7, 39:14, 39:16, 39:20, 39:25, 40:4, 40:14, 41:6, 41:14, 43:1, 43:4, 43:20, 43:23, 43:25
**knowledge** [1] - 13:23

## L

**Lab** [5] - 7:19, 11:19, 12:11,

13:25, 25:22
**lab** [4] - 8:23, 9:2, 9:6, 21:16
**Laboratory** [2] - 6:22, 7:7
**labs** [3] - 7:2, 23:19, 24:8
**Large** [1] - 4:3
**last** [3] - 12:23, 34:8, 34:22
**Laura** [1] - 9:2
**law** [1] - 25:2
**lead** [1] - 28:25
**learn** [1] - 22:10
**least** [7] - 10:17, 19:11, 19:23, 25:25, 37:24, 39:1, 39:6
**leave** [2] - 37:5, 37:12
**led** [3] - 20:5, 20:13, 21:7
**lengthy** [1] - 10:23
**less** [1] - 25:20
**letter** [3] - 13:25, 28:15, 28:21
**level** [1] - 17:7
**linked** [2] - 14:18, 15:7
**literally** [1] - 15:17
**look** [4] - 17:18, 29:20, 33:4, 39:2
**looked** [1] - 6:5
**looking** [2] - 17:19, 32:18
**lowest** [1] - 33:20
**Lydall** [1] - 6:7

## M

**magical** [2] - 24:13, 24:21
**MagLab** [2] - 7:9, 7:17
**magnet** [1] - 7:1
**Magnet** [5] - 7:19, 11:19, 12:11, 13:25, 25:22
**magnetic** [1] - 7:6
**major** [1] - 9:5
**manager** [1] - 7:23
**manning** [1] - 6:7
**March** [1] - 14:6
**marked** [1] - 12:15
**marking** [1] - 12:14
**Massachusetts** [2] - 5:3, 5:5
**materials** [1] - 6:8
**matter** [3] - 4:13, 5:24, 35:20
**mean** [12] - 9:20, 16:12, 18:11, 21:2, 21:15, 21:19, 27:25, 29:25, 32:2, 35:10, 35:18
**means** [2] - 31:10, 33:15
**medical** [1] - 25:3
**meet** [4] - 8:8, 10:13, 10:16, 25:24
**meeting** [6] - 10:9, 42:3, 42:14, 42:18, 42:21, 42:23
**memo** [1] - 19:15
**memorized** [1] - 32:19
**met** [1] - 8:6

**military** [1] - 5:14
**mine** [1] - 8:18
**minute** [2] - 15:10, 36:25
**mm-hm** [7] - 12:2, 14:8, 19:9, 21:1, 22:16, 32:4, 32:21
**month** [1] - 7:8
**months** [1] - 14:7
**morning** [1] - 4:12
**most** [1] - 24:4
**mouth** [1] - 39:21
**moved** [1] - 15:23
**MR** [105] - 4:11, 10:4, 10:12, 11:14, 12:20, 12:23, 13:1, 13:7, 14:13, 14:16, 14:21, 16:11, 16:13, 16:17, 16:24, 18:22, 18:23, 19:3, 19:4, 19:14, 20:1, 20:16, 22:12, 22:13, 22:17, 22:22, 26:18, 26:19, 26:22, 26:24, 27:1, 27:5, 27:7, 27:11, 29:14, 29:17, 29:18, 30:9, 30:11, 31:5, 31:7, 31:8, 32:22, 33:1, 33:9, 34:10, 34:11, 34:20, 35:9, 35:24, 36:1, 36:12, 36:14, 36:16, 36:19, 36:22, 36:24, 37:3, 37:5, 37:9, 37:11, 37:13, 37:18, 37:20, 37:21, 37:22, 37:23, 37:25, 38:1, 38:3, 38:4, 38:6, 38:7, 38:10, 38:22, 38:25, 39:1, 39:2, 39:3, 39:4, 39:5, 39:7, 39:12, 39:14, 39:15, 39:16, 39:17, 39:20, 39:23, 39:25, 40:2, 40:4, 40:8, 40:11, 40:14, 41:6, 41:14, 42:25, 43:1, 43:4, 43:20, 43:22, 43:23, 43:24, 43:25
**multiple** [2] - 12:21, 28:20
**murder** [1] - 34:2
**murdered** [1] - 34:13

## N

**name** [2] - 4:12, 33:15
**narrative** [1] - 36:3
**national** [3] - 7:2, 23:19, 24:8
**National** [2] - 6:22, 7:6
**nature** [2] - 24:25, 33:15
**necessarily** [4] - 18:20, 18:24, 19:12, 20:14
**need** [5] - 8:23, 15:11, 20:4, 39:24, 42:3
**needed** [4] - 15:16, 15:18, 15:25, 19:20
**needing** [1] - 20:6
**needs** [3] - 14:19, 15:7, 17:19
**never** [2] - 22:20
**new** [4] - 15:24, 20:24, 20:25,

21:8
**New** [1] - 6:6
**non** [1] - 6:7
**nondisciplinary** [2] - 16:6, 16:10
**nonrenewal** [31] - 8:21, 11:5, 11:22, 13:11, 14:9, 14:11, 14:18, 15:1, 15:6, 15:9, 15:11, 16:6, 16:9, 17:1, 17:4, 17:5, 17:11, 17:18, 18:19, 19:19, 19:22, 22:4, 22:7, 27:17, 35:12, 35:21, 36:4, 36:5, 40:13, 40:15, 40:22
**nonrenewals** [2] - 14:18, 17:18
**nonrenewed** [2] - 40:17, 41:4
**nonrenewing** [1] - 36:6
**noon** [1] - 27:8
**Notary** [1] - 4:2
**notes** [1] - 42:23
**nothing** [3] - 17:4, 31:18, 33:2
**notice** [1] - 30:17
**number** [3] - 8:25, 10:24, 17:23
**nurturing** [1] - 25:15

## O

**oath** [2] - 4:8, 15:17
**object** [6] - 37:12, 38:2, 38:5, 38:7, 39:5, 39:9
**objected** [1] - 16:13
**objecting** [2] - 36:23, 37:17
**objection** [1] - 31:10
**obtain** [1] - 5:25
**obtained** [2] - 6:3, 7:5
**occasion** [1] - 8:7
**occur** [1] - 8:16
**occurred** [1] - 30:25
**office** [1] - 8:17
**old** [1] - 35:18
**once** [1] - 8:6
**one** [19] - 6:6, 6:11, 8:9, 8:10, 9:15, 10:6, 10:25, 13:11, 13:15, 22:3, 22:10, 25:25, 26:1, 35:3, 35:6, 39:23, 43:5, 43:17
**open** [5] - 12:13, 12:19, 12:21, 13:2, 13:3
**opportunity** [1] - 20:17
**organization** [3] - 17:19, 17:21, 17:24
**organize** [1] - 7:21
**originally** [1] - 4:25
**outcome** [3] - 18:14, 18:15, 35:6
**overall** [1] - 25:5

**oversaw** [1] - 7:2

**P**

**p.m** [2] - 27:10, 44:3
**packet** [1] - 16:3
**page** [4] - 21:11, 33:11, 37:24, 37:25
**pages** [1] - 10:24
**Palm** [1] - 8:14
**palm** [4] - 8:19, 9:25, 11:4, 14:6
**papers** [1] - 25:17
**paperwork** [1] - 10:9
**paragraph** [1] - 41:21
**park** [32] - 4:13, 8:1, 8:3, 8:4, 8:6, 8:10, 8:21, 9:1, 9:3, 9:6, 9:14, 9:23, 10:7, 10:9, 10:10, 10:13, 11:4, 11:6, 12:3, 12:21, 13:14, 14:5, 16:3, 16:25, 18:13, 25:24, 26:11, 29:2, 41:18, 42:7, 42:11, 43:6
**Park** [1] - 4:14
**park's** [5] - 8:12, 10:18, 27:14, 35:2
**parochial** [1] - 5:10
**part** [6] - 18:19, 19:11, 19:23, 19:24, 21:25, 34:18
**participate** [1] - 10:1
**participated** [1] - 9:22
**particular** [1] - 19:15
**party** [1] - 29:3
**passed** [1] - 17:7
**passive** [1] - 22:25
**passive-aggressive** [1] - 22:25
**pay** [1] - 34:16
**pending** [2] - 36:13, 37:4
**people** [12] - 7:3, 17:20, 20:10, 20:18, 21:17, 22:23, 25:16, 30:16, 31:25, 32:2, 34:24, 42:3
**per** [1] - 32:8
**performance** [2] - 9:1, 28:8
**performing** [1] - 30:18
**permanently** [1] - 9:10
**person** [3] - 20:10, 20:12, 30:17
**personnel** [13] - 15:12, 15:19, 15:24, 18:21, 18:25, 19:8, 19:12, 19:16, 19:21, 19:24, 20:5, 20:14, 21:7
**perspective** [1] - 30:14
**Ph.D** [5] - 5:23, 5:25, 6:4, 25:4, 25:7
**physicist** [1] - 6:12
**physics** [1] - 5:24
**place** [1] - 20:22
**point** [3] - 16:4, 39:7, 43:17

**policy** [1] - 35:11
**polite** [2] - 26:7, 26:12
**portion** [2] - 16:19, 28:19
**posed** [1] - 38:13
**position** [11] - 6:10, 6:11, 7:5, 15:24, 15:25, 16:7, 21:8, 24:20, 32:1, 35:2, 42:7
**positions** [1] - 6:15
**positive** [1] - 25:19
**potentially** [1] - 9:4
**precisely** [1] - 29:23
**predetermination** [7] - 17:11, 18:1, 18:9, 18:10, 18:12, 19:22, 35:10
**predetermined** [2] - 16:10, 18:14
**predetermining** [1] - 35:6
**presentation** [2] - 16:4, 16:5
**presented** [5] - 10:22, 10:24, 11:4, 13:14, 35:2
**presenting** [1] - 8:10
**pretty** [5] - 4:15, 23:22, 25:5, 36:17, 38:11
**previously** [3] - 12:15, 14:2, 27:13
**problems** [1] - 26:12
**procedure** [4] - 10:2, 27:14, 29:23, 29:24
**process** [16] - 13:11, 15:6, 17:4, 17:5, 17:10, 17:18, 18:18, 22:8, 27:23, 28:1, 29:8, 29:10, 31:2, 32:7, 36:10, 41:24
**Professional** [1] - 4:2
**professional** [1] - 40:3
**professor** [1] - 9:1
**progressive** [15] - 27:23, 28:4, 28:5, 29:7, 29:10, 30:6, 32:16, 33:11, 33:15, 34:7, 34:18, 41:21, 42:9, 42:11, 42:19
**prohibited** [1] - 9:10
**project** [1] - 7:20
**proper** [2] - 38:1, 39:5
**proposal** [1] - 7:22
**provide** [1] - 30:20
**provided** [3] - 30:25, 42:8, 42:11
**provides** [1] - 33:5
**provision** [1] - 41:12
**provost** [1] - 26:4
**Public** [1] - 4:2
**pull** [4] - 29:13, 29:19, 32:17, 33:1
**pursuit** [2] - 24:22, 24:25
**putting** [3] - 21:8, 31:10, 39:20

**Q**

**quacks** [1] - 35:19
**quality** [1] - 38:14
**quantity** [1] - 20:11
**questions** [3] - 4:20, 26:13, 43:20
**quickly** [2] - 4:14, 4:18
**quote** [1] - 26:6
**quote/unquote** [1] - 20:14

**R**

**read** [6] - 14:3, 16:19, 21:21, 21:23, 36:19, 44:1
**ready** [1] - 37:1
**really** [2] - 23:15, 34:2
**reason** [2] - 13:21, 41:18
**reasons** [1] - 17:23
**reassigned** [1] - 9:3
**receive** [1] - 5:21
**received** [3] - 5:23, 10:8, 12:3
**recently** [1] - 7:20
**Recess** [1] - 27:10
**recognize** [1] - 13:8
**recognizing** [1] - 23:9
**record** [4] - 18:19, 19:19, 31:11, 38:11
**recorded** [2] - 42:21, 42:22
**records** [1] - 33:1
**Red** [1] - 7:21
**refer** [2] - 29:25, 32:18
**referring** [1] - 18:6
**reframe** [1] - 16:23
**refute** [1] - 36:5
**regarding** [1] - 43:12
**regardless** [1] - 43:15
**Registered** [1] - 4:2
**relation** [1] - 43:5
**remark** [1] - 23:13
**remarks** [1] - 23:14
**remember** [3] - 7:8, 15:13, 43:14
**remind** [1] - 11:16
**removed** [1] - 31:25
**renew** [1] - 17:22
**renewal** [2] - 7:22, 16:21
**renewed** [1] - 15:15
**repeat** [4] - 4:19, 8:2, 16:15, 16:17
**rephrase** [1] - 41:8
**report** [1] - 28:12
**Reporter** [1] - 4:2
**reporter** [1] - 16:20
**reprimand** [11] - 12:4, 12:7, 13:18, 13:22, 14:7, 14:12, 19:1, 19:11, 28:15, 30:24, 34:15

**requested** [1] - 16:19
**required** [1] - 33:4
**research** [6] - 6:12, 15:12, 15:18, 19:20, 20:9, 29:4
**Research** [1] - 6:14
**respect** [2] - 4:16, 25:16
**response** [2] - 27:16, 28:13
**review** [6] - 7:21, 10:18, 10:25, 11:13, 13:15, 41:23
**reviewed** [3] - 10:8, 11:21, 19:1
**reviewing** [1] - 7:20
**Rodriguez** [1] - 4:1
**rule** [2] - 34:8, 40:9
**rules** [1] - 32:16
**run** [1] - 5:11

**S**

**save** [3] - 12:25, 13:1, 13:5
**saw** [1] - 42:10
**schedules** [1] - 4:16
**school** [8] - 5:4, 5:6, 5:7, 5:10, 5:11, 5:18, 25:2, 25:3
**scientists** [1] - 7:3
**screaming** [2] - 22:25, 23:11
**screen** [1] - 33:2
**screw** [1] - 31:16
**second** [1] - 11:18
**Section** [3] - 41:2, 41:21
**see** [6] - 9:3, 12:18, 13:3, 13:18, 18:5, 23:3
**seem** [1] - 38:12
**send** [3] - 12:17, 17:12, 29:22
**sense** [1] - 40:16
**separate** [2] - 8:25, 15:9
**series** [2] - 6:14, 7:18
**serious** [7] - 28:14, 28:22, 28:23, 28:25, 30:3, 31:22, 32:1
**served** [1] - 7:21
**services** [1] - 15:16
**several** [2] - 22:19, 38:16
**share** [1] - 26:2
**shock** [1] - 22:9
**shooting** [1] - 32:2
**short** [1] - 27:8
**show** [2] - 11:11, 12:13
**showed** [1] - 19:16
**showing** [2] - 13:4, 21:20
**signed** [1] - 43:11
**significance** [2] - 14:11, 14:25
**significant** [1] - 28:7
**simply** [1] - 39:21
**single** [2] - 22:10, 40:3
**Sisters** [1] - 5:12
**situation** [4] - 8:12, 8:15,

25:6, 32:12
**situations** [3] - 32:10, 32:14, 34:1
**slightly** [1] - 24:1
**soliloquy** [1] - 38:8
**solitary** [1] - 22:10
**someone** [5] - 32:11, 32:15, 34:1, 35:5, 40:17
**sorry** [6] - 8:2, 13:18, 14:14, 16:22, 31:6, 40:6
**sound** [2] - 38:20, 39:8
**sounds** [1] - 38:2
**speaking** [1] - 10:19
**specific** [1] - 15:22
**specifically** [2] - 18:8, 41:19
**specifics** [3] - 11:7, 11:9, 11:17
**square** [1] - 15:20
**St** [1] - 5:9
**stand** [1] - 36:3
**stands** [1] - 41:18
**start** [1] - 34:14
**started** [2] - 5:18, 38:17
**starting** [2] - 30:15, 37:6
**starts** [3] - 30:7, 30:12, 33:19
**State** [6] - 4:3, 5:20, 18:15, 24:14, 24:21, 25:14
**statement** [2] - 22:24, 33:23
**statements** [4] - 21:22, 21:24, 37:16, 39:11
**states** [1] - 41:20
**step** [7] - 8:9, 8:10, 9:15, 10:6, 13:11, 13:15, 43:5
**steps** [2] - 29:7, 29:9
**stepwise** [1] - 31:2
**still** [1] - 7:13
**stole** [1] - 35:4
**stop** [5] - 4:18, 31:9, 31:15, 36:20, 37:1
**stressful** [12] - 23:22, 23:25, 24:2, 24:4, 24:5, 24:7, 24:8, 24:23, 25:1, 25:5, 25:12, 25:20
**student** [3] - 23:20, 25:7, 25:15
**students** [14] - 9:5, 9:7, 9:11, 20:7, 21:3, 21:4, 21:6, 21:13, 21:18, 21:22, 21:24, 22:11, 22:20, 23:15
**stuff** [2] - 6:9, 22:7
**submission** [2] - 10:19, 14:3
**submitted** [4] - 10:7, 12:9, 12:24, 16:3
**sufficient** [2] - 40:9, 40:10
**suggesting** [1] - 40:4
**summarize** [1] - 30:7
**supported** [1] - 41:12
**supposed** [1] - 37:11
**surprised** [1] - 22:18

**surprising** [1] - 22:21
**suspension** [2] - 34:15, 34:16
**sworn** [1] - 4:7

**T**

**team** [2] - 7:2, 25:18
**Team** [1] - 7:21
**technical** [1] - 30:18
**technically** [1] - 30:18
**technicians** [1] - 7:3
**tecum** [1] - 33:3
**terminate** [2] - 34:17, 35:12
**terminated** [3] - 32:11, 32:13, 32:15
**terminating** [1] - 36:8
**termination** [8] - 28:25, 33:22, 34:7, 34:18, 35:4, 35:7, 35:13, 35:21
**testified** [2] - 4:8, 15:17
**testimony** [9] - 15:10, 15:13, 15:14, 15:21, 15:22, 15:23, 17:25, 37:8, 42:14
**Texas** [1] - 5:6
**THE** [20] - 4:9, 10:5, 12:25, 13:3, 14:14, 14:17, 16:12, 16:15, 16:21, 26:23, 26:25, 27:4, 27:6, 29:16, 30:10, 31:6, 32:25, 33:7, 35:25, 44:2
**theft** [1] - 34:1
**Thomas** [1] - 4:12
**three** [2] - 23:24, 24:11
**timeline** [1] - 11:25
**title** [1] - 7:16
**took** [2] - 20:22, 26:5
**top** [1] - 32:19
**topic** [1] - 11:20
**Toronto** [2] - 5:17, 25:14
**totally** [2] - 26:7, 43:10
**towards** [5] - 21:3, 21:12, 21:17, 21:18, 22:11
**trail** [1] - 37:15
**transferred** [1] - 5:19
**transpired** [1] - 28:16
**treated** [1] - 25:16
**truth** [4] - 4:7, 9:17, 31:18
**try** [2] - 13:4, 21:5
**trying** [2] - 30:5, 40:7
**two** [5] - 7:18, 7:24, 17:7, 23:18, 43:2
**type** [2] - 22:3, 28:16
**typically** [2] - 28:23, 30:15

**U**

**ultimately** [1] - 33:22
**unacceptable** [1] - 21:16
**uncomfortable** [3] - 23:7,

23:8, 23:10
**under** [4] - 15:17, 29:5, 32:15, 34:17
**undergrad** [1] - 5:18
**undergraduate** [1] - 25:10
**universities** [1] - 23:3
**university** [12] - 7:18, 10:8, 14:20, 15:7, 15:16, 15:25, 21:6, 21:18, 25:14, 26:4, 34:9, 36:3
**University** [7] - 5:17, 5:19, 5:20, 18:16, 24:14, 24:21, 25:14
**unless** [3] - 33:4, 35:3, 35:5
**untrue** [1] - 39:21
**up** [14] - 9:15, 12:14, 12:19, 13:4, 21:12, 27:9, 27:12, 29:13, 29:19, 31:17, 32:17, 33:1, 33:21, 35:5

**V**

**viable** [1] - 17:16
**violated** [9] - 36:5, 40:23, 41:2, 41:3, 41:13, 41:19, 42:9, 42:12, 42:19
**violates** [1] - 35:7
**violation** [3] - 40:13, 41:3, 41:20
**violent** [1] - 31:22

**W**

**W.K** [1] - 12:21
**wait** [2] - 15:10, 36:25
**walks** [1] - 35:19
**wants** [1] - 36:3
**warrant** [1] - 35:4
**ways** [1] - 24:1
**whole** [2] - 18:18, 23:15
**witness** [2] - 38:17, 44:1
**WITNESS** [20] - 4:9, 10:5, 12:25, 13:3, 14:14, 14:17, 16:12, 16:15, 16:21, 26:23, 26:25, 27:4, 27:6, 29:16, 30:10, 31:6, 32:25, 33:7, 35:25, 44:2
**word** [1] - 39:23
**words** [6] - 4:17, 18:13, 29:11, 31:19, 39:21, 42:17
**works** [2] - 7:25, 30:6
**worrying** [1] - 31:13
**write** [1] - 25:17
**written** [10] - 12:4, 12:6, 12:9, 28:15, 28:19, 30:24, 32:7, 34:14, 43:6, 43:17
**wrote** [1] - 15:19

**Y**

**year** [4] - 5:25, 6:11, 7:9, 43:9
**years** [5] - 6:15, 6:24, 23:18, 23:20, 25:13
**yelled** [1] - 22:20
**yelling** [2] - 22:24, 23:11
**yesterday** [1] - 26:5
**York** [1] - 6:6

**Z**

**Zoom** [6] - 8:6, 8:8, 42:14, 42:18, 42:21, 42:23